UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| SHON COOPER AND JACKIE READ, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § | 4:23-cv-140-SEB-KMB |
| INTACT PROFESSIONAL HEALTH & SAFETY SERVICES, INC., | § § § | |
| DEFENDANT | § § | JURY TRIAL DEMANDED |

**PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF FLSA COLLECTIVE ACTION AND SETTLEMENT AGREEMENT**

Named Plaintiffs Shon Cooper and Jackie Read on behalf of themselves and all other opt ins (collectively "Plaintiffs") submit this Unopposed Motion for Final Approval of FLSA Collective Action and Settlement Agreement.

## I.      INTRODUCTION

After this matter settled at mediation and the parties formalized the settlement agreement, Plaintiffs submitted an Unopposed Motion for Approval of Settlement Agreement on May 2, 2025. Dkt. 68.

On June 5, 2025, this Court denied the Motion, expressing concern about the fact that 1) Plaintiffs failed to seek final certification of the collective action, even though five safety Inspectors filed opt in consents prior to the conditional certification of the collective action; 2) a consent had been filed for Martin Itzep, but Mr. Itzep's name was not contained as a beneficiary to the settlement agreement; and 3) the name of opt in David Murphy did not match up with a

similar name (David Ryan) referenced in the settlement agreement.  Dkt 70.  Plaintiffs submit this Motion in Response to the Court's concerns.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Basis for the Lawsuit

Intact provides personnel staffing for projects throughout several different states to its clients in the areas of occupational safety consulting and construction safety management, emergency response and rescue, environmental consulting, engineering estimation and consulting, and project coordination.

Plaintiffs were safety inspectors and consultants ("Inspectors") of various types who worked at the work sites of Intact's clients, including construction sites and manufacturing facilities.  Intact paid its Inspectors on an hourly basis without overtime premiums for any hours worked over forty per week.

On August 21, 2023, Plaintiffs Cooper and Read, former hourly Inspectors for Defendant, filed an FLSA wage and hour claim against Defendant that sought certification as a collective action. Dkt. 1. Plaintiffs alleged that they, as well as other similarly situated, non-exempt, hourly Inspectors, had been unlawfully deprived of their overtime wages based on Defendant's policy of paying of straight time wages for all hours over forty per workweek. *Id.*  Plaintiffs sought unpaid overtime wages, liquidated damages and reasonable attorneys' fees, costs, and expenses on behalf of themselves and all other similarly situated employees.  *Id.*  Defendants argued that Plaintiffs were not entitled to overtime payments under the FLSA because they were properly classified as independent contractors.

**B.**     **Evidence Supporting Initial Conditional Certification**

On September 24, 2024, the Parties filed a First Amended Joint Stipulation regarding Conditional Certification. Dkt. 50.  In that Amended Stipulation, Plaintiffs provided evidence sufficient to support conditional certification under the first step of the two step inquiry the Seventh Circuit uses to analyze certification of collective actions.[1]

In their Stipulation, Plaintiffs provided evidence, through the Declarations of Shon Cooper and Darlene Flueckiger, that the proposed Collective of employees were similarly situated because: (a) they were employed in the same or similar positions as Named Plaintiffs (safety inspectors); (b) they were subject to the same or similar unlawful practices, policies, or plans (they were paid straight time for all overtime hours); and (c) their claims were based upon the same factual and legal theories (safety managers are non-exempt, are paid hourly, and were denied overtime premiums).   Dkt. 50-001 (Cooper Declaration) and 50-002 (Flueckiger Declaration).

Plaintiffs also presented evidence in the Stipulation via the above referenced Declarations that the employment relationships between Defendant and the members of the collective were the same and differed, if at all, only in name, assignment, and hourly rate of pay.  *Id.*  In addition to these common issues of fact, the collective class proposed by the Parties above had several common issues of fact and law, including (1) whether Intact violated the FLSA by not paying overtime premiums for all hours worked over forty per workweek and (2) the amount of damages to which the collective members would be entitled if Plaintiffs proved that Intact violated the FLSA.  *Id.*

---

[1] The first step of the analysis is called the "notice stage" and "involves an analysis of the pleadings and affidavits which have been submitted to determine whether notice should be given to potential class members." *Imel v. DC Constr. Servs., Inc.*, No. 1:19-cv-0634-TWP-MPB, 2020 U.S. Dist. LEXIS 94855, at *5 (S.D. Ind. 2020). The second step, which usually occurs after discovery has largely been completed, allows a court the opportunity to determine whether the class should be decertified or restricted because various putative class members are not in fact similarly situated as required by the statute. *Id.*

### C.    Conditional Certification is Granted

On October 2, 2024, Magistrate Barr found that Plaintiffs had made the factual showing necessary to show that Plaintiffs and potential plaintiffs were similarly situated and subject to a common policy, and conditionally certified this lawsuit as a collective action under the FLSA 29 USC § 216(b) for the following individuals:

> All individuals who worked for Intact Professional Health & Safety Services, Inc. as safety managers or who performed substantially the same or similar duties who were paid on an hourly basis between May 1, 2022 and the present date.

Dkt. 53, p. 2.

Having found the Inspectors to be similarly situated, Magistrate Barr permitted notice of this FLSA collective action to be mailed and emailed to forty-four (44) potential opt-in plaintiffs. Ten (10) timely returned their opt-in Consent Forms by the December 16, 2024, deadline.

Plaintiffs assert, and Defendants agree, that no relevant circumstances have changed since the findings made in Magistrate Barr's October 2, 2024, Order, and that Defendants' primary defense, that Plaintiffs and all other hourly Inspectors were independent contractors, would have continued to have been applicable to and asserted against *all* Inspectors in a similar manner had this case not settled. Declaration of Douglas B. Welmaker, Exhibit A, ¶18.[2]

Additional support for the fact that Plaintiffs, the opt ins, and all other hourly Inspectors were similarly situated and subjected to the same allegedly unlawful employment policy (evidence that was not presented to Magistrate Barr in the Parties' Amended Joint Stipulation) is demonstrated in an email sent from Greg Duvall, Intact's Director of Operations, to Intact's Inspectors, dated September 22, 2023 (31 days after suit was filed in this case).  In this email, Mr. Duvall notifies the Inspectors that Intact is changing its pay structure and that Intact will, starting

---

[2] *Also see* Certification at the bottom of this Motion, whereby the undersigned certifies that he conferred with counsel for Defendant and that she confirmed that the statements contained in this paragraph are true and correct.

October 1, 2023, begin paying overtime premiums for all hours worked over forty per workweek.

Intact is, in effect, notifying its Inspectors that it is coming into compliance with the FLSA:

From: **g.duvall@intactservice.com** <g.duvall@intactservice.com>
Date: Fri, Sep 22, 2023 at 1:48 PM
Subject: Notice of Overtime pay - 10/1/2023
To: g.duvall@intactservice.com <g.duvall@intactservice.com>, Shawn Hammontree <shammontree@intactservice.com>

Good Afternoon valued team member,

    I am writing you today to formally inform you of an upcoming change to our pay structure which will impact you. Beginning on the First of October of this year, 2023, on your current assignment, your weekly time worked in excess of 40 hours will be compensated at an adjusted overtime rate of (1.5x) your current hourly rate. I hope that you are as happy to receive this information as I am to deliver it.
    I am very appreciative of the excellent teams that we have and the accomplishments that we have made this far, together. Things may not always be easy, but together we are building the next generation of American Infrastructure and doing so safely. My goal for you is to know that you are valued as an employee and an individual. Through the good and the bad we will continue to do our part to make that a reality. Please feel free to reach out to me with any questions. Have a great day and an excellent weekend.

Best Regards,

*Greg Duvall*
*Director of Operations*
*Intact Engineering Services*
*Office:   877.434.7342*
*Mobile:  228.364.2110*
*Website:* intactinc.net
*G.Duvall@intactservice.com*

Intact's Inspectors were similarly situated in that they were, prior to the instant lawsuit, all subjected to Intact's allegedly illegal policy of paying straight time for all hours worked over forty per workweek.  This conclusion is buttressed by the language in the contracts Intact sent out to its Inspectors, three examples of which are set forth below.  Each contract reflects that compensation for the Inspector would be paid at "straight time" "for every hour worked."

April 13, 2023

Dear Ms. Schuman,

We are pleased to extend an offer for you to join Intact, Professional Health & Safety Services, as a Safety Supervisor for Universal Piping Ind., in Lake Orion at General Motors.

Compensation for the position includes: straight time hourly rate of $40per/hour for every hour worked. Travel expenses for the initial and final trip to/from the job will be compensated via billable hours at the agreed straight time hourly rate of ($40). Please add travel time on your first and last timesheets. Payroll is set up for contract employees on a bi-weekly basis for the 1st and 15th of each month (if payroll falls on a holiday or weekend, then payroll will be processed the next business day). Timesheets are due Every Monday for the previous week and must be signed by an authorized client supervisor. You will come aboard as a 1099 contract employee.

Your start date is April 17th, 2023: Your On-site contact is:
Jose Estrada ▉▉▉

Site Address: ▉▉▉▉▉▉▉▉

Please confirm your acceptance of this offer by signing and returning this letter. Please don't hesitate to let me know if you have any questions.

Welcome to the team!

---

Employment Offer – David Murphy

August 18, 2020

Dear Mr.Murphy,

We are pleased to extend an offer for you to join Intact, Professional Health & Safety Services, as a Safety Monitor for Lesco, at RIVIAN Motors in Normal, IL.

Compensation for the position includes an hourly rate of $31 per/hour, for every hour worked and $90 per day for living expenses. Travel expenses for the initial and final trip to/from the job will be compensated via billable hours at the agreed straight time hourly rate. Please add travel time on your first and last timesheets equaling to the number of hours it would take you to drive from your home to the job site. Payroll is set up for contract employees on a bi-weekly basis for the 1st and 15th of each month (if payroll falls on a holiday or weekend, then payroll will be processed the next business day). Timesheets are due by 11am on the last day of the month and 15th and must be signed by an authorized supervisor onsite. You will come aboard as a 1099 contract employee.

Your start date is August 19, 2020. Please contact Ken Smith - Safety Manager - ▉▉▉▉ He will be your on-site contact.

Please confirm your acceptance of this offer by signing and returning this letter, along with your onboarding paperwork. Please don't hesitate to let me know if you have any questions.

Welcome to the team!

---

Employment Offer – Dan Greenia

November 13, 2020

Dear Mr.Greenia

We are pleased to extend an offer to join Intact, Professional Health & Safety Services, as a Safety Supervisor for Universal Piping ind., in Hamtramck, MI at General Motors Project Zero.

Compensation for the position includes: straight time hourly rate of $38.50/hour for every hour worked. Payroll is set up for contract employees on a bi-weekly basis for the 1st and 16th of each month (if payroll falls on a holiday or weekend, then payroll will be processed the next business day). Timesheets are due Every Monday for the previous week and must be signed by an authorized client supervisor. You will come aboard as a 1099 contract employee.

Your start date is November 16, 2020. Your Contact is Dave Matthes ▉▉▉▉

Please confirm your acceptance of this offer by signing and returning this letter. Please don't hesitate to let me know if you have any questions.

Welcome to the team!

Intact's payment structure was also reflected on the Inspector's paychecks, such as the paychecks set forth below from Named Plaintiffs Jackie Read and Shon Cooper, respectively, where Intact is paying straight time for all hours worked:





Finally, Intact's pay policy is also reflected in a spreadsheet produced by Defendant after the opt in period closed. A copy of this spreadsheet is attached hereto as Exhibit B. This spreadsheet reflects that all ten opt ins were paid the same hourly rate for all hours worked, whether over or under forty hours per week. All were subjected to the same alleged illegal policy of being paid straight time pay for all hours worked, without being paid overtime premiums for hours worked over forty. Ex. B.

The email from Greg Duvall informing the Inspectors that Intact was changing its pay policy for overtime hours, as well as the contracts, the paychecks, and the spreadsheet reflecting straight time pay for all hours worked by the opt ins all establish, separate and apart from the evidence presented to and considered by Magistrate Barr, that all 17 Inspectors who have joined this matter are similarly situated.

After the opt in period closed, the parties agreed to mediate this case. On March 26, 2025, Named Plaintiff Cooper, on behalf of the collective, and Defendant Intact participated in a full day of private mediation and reached an agreement, subject to Court approval, to resolve the claims of Plaintiffs and the opt ins for significant monetary relief. The settlement followed a thorough investigation by Plaintiffs' counsel and production of wage data and data of hours worked by Plaintiffs and the opt ins, as well as an exchange of Plaintiffs' and Defendant's mediation statements in advance of the full day mediation.

Plaintiffs now request the Court's final certification of the FLSA collective action, approval of the settlement agreement, approval of the agreed-upon attorneys' fees and costs, and an Order dismissing this action while retaining it on the Court's docket for purposes of enforcing the terms of the settlement agreement. As part of that Order, the parties request that the Court approve the mailing of both rounds of settlement checks to all collective members and their counsel pursuant to the terms of the settlement agreement.

Accordingly, Plaintiffs request that the Court issue an Order:

(1) issuing final certification of this lawsuit as a collective action pursuant to the FLSA for settlement purposes;

(2) approving the $260,000.00 in settlement funds set forth in the settlement agreement;

(3) approving counsel's requests for attorneys' fees, costs, and expenses incurred in the litigation;

(4) permitting Intact to distribute all funds to Plaintiffs and their counsel pursuant to the terms of the parties' settlement agreement as per Attachment A to the Settlement Agreement; and

(5) entering a final judgment dismissing this action with prejudice, and retaining jurisdiction only for purposes of enforcing the terms of the settlement agreement.

## III.    OVERVIEW OF CONSENT PROCESS, LITIGATION AND SETTLEMENT

### A.    The Consent Forms of Martin Itzep and David Murphy

#### 1.    Mr. Martin Itzep

Mr. Martin Itzep never worked for Defendant and should not have been provided with an opt in form.  His inclusion in this matter was the result of an oversight by ILYM, the administrator Plaintiffs hired to oversee the mail out of the opt in forms.  Attached as  Exhibit C is a Declaration from Brent Baker of ILYM, a case manager for ILYM.  In his Declaration, Mr. Baker explains that he was the case manager assigned to oversee the mailing of paper notices to the 44 potential collective members based on a list of potential collective members provided to ILYM by Plaintiffs' counsel.  Ex. C.  Mr. Baker testifies that during the preparation of the mailing, ILYM accidentally sent several notices for this case to members of a class in another case ILYM was administering at the time.  *Id.*  Mr. Baker states that one of the individuals to whom the notice in this case was mistakenly sent was Martin Itzep, and that Mr. Itzep returned his signed consent for this case to ILYM, who then forwarded it to Plaintiffs' counsel.  *Id.*  Mr. Baker testifies that Mr. Itzep was not part of the potential collective in this case and that notice should never have been sent to him.  *Id.* Counsel for Defendant has confirmed that Mr. Itzep did not work for Intact.  Ex. A, ¶ 17.  Mr.

Itzep's inclusion in this matter was a mistake, and he was not allocated any of the settlement funds in this case.

### 2. Mr. David Murphy

Opt in David Murphy was mistakenly listed as "David Ryan" in the settlement agreement. Ex. A, ¶17. Mr. Murphy's middle name is Ryan, and counsel mistakenly referred to him by his middle name, Ryan, instead of his last name, Murphy, in the settlement agreement. *Id*. David Murphy was employed by Intact, he properly signed and dated a consent form (Dkt. 18-1) and the parties have executed an addendum to the Settlement Agreement clarifying that David Ryan should have been named as David Murphy. *Id*; Exhibit F. In the Addendum, attached here as Exhibit F, the Parties stipulate that the reference in the settlement agreement in this matter to "David Ryan" is actually to David Murphy, who has a middle name of "Ryan." Ex. F. No individual with the name "David Ryan" was on the list of similarly situated individuals Defendant provided to Plaintiffs, but "David Murphy" was. *Id*. David Murphy submitted an opt-in form and David Murphy is the individual who is to receive the payment designated in the settlement agreement to be paid to David Ryan. *Id*.

### B. Investigation, Litigation and Mediation

Counsel for Plaintiffs fully investigated the merits of the potential claims and defenses before filing this lawsuit. As part of that investigation, counsel interviewed Plaintiffs, some of the voluntary opt-in plaintiffs (directly and indirectly) and assessed Plaintiffs' claims and the potential defenses. Exhibit A, Welmaker Dec., ¶8.

After the Complaint was filed, the parties engaged in pre-notice discovery and then agreed to stipulate to the issuance of notice in this case. *Id.;* Dkt. 50. Once Plaintiffs provided evidence to Magistrate Barr that the Plaintiffs and other potential safety managers were similarly situated,

the collective was conditionally certified by the Magistrate, notice issued, and ten (10) additional opt in consents were ultimately received.  The parties continued exchanging significant amounts of data, including supplementary time and payroll records as well as amended damages calculations, and ultimately agreed to mediate this case before Frank Neuner, who is an experienced and well-respected complex action mediator.   Exhibit A, Welmaker Dec, ¶8; Exhibit D, Buenker Dec, ¶8.

Prior to the mediation, Defendant produced wage and hour data for all Plaintiffs and opt ins, and Plaintiffs in turn provided amended damages calculations.  Ex. A, Welmaker Dec., ¶9. Additionally, prior to the mediation, Plaintiffs provided Defendant with their mediation statement and Defendant reciprocated by providing Plaintiffs with their mediation statement, so that there would be no surprises at mediation.  *Id*. Finally, Plaintiffs made a pre-mediation offer to Defendant, and Defendant made a pre-mediation counter.  *Id*. During the full day mediation which was held in person at Mr. Neuner's offices in St. Louis, Missouri, the parties exchanged multiple offers before reaching an agreement to settle this matter, which was finalized on April 25, 2025.  *Id*.

### C.    Settlement Terms

The Parties' final Settlement Agreement is attached as Exhibit E.  Among other things, the settlement agreement requires Defendant to pay a total amount of $260,000.00.  Ex. A, Welmaker Dec., ¶10, Ex. D, Buenker Dec., ¶10, Ex. E, Settlement Agreement, ¶15, p. 5 and Attachment A to the Settlement Agreement.   The Settlement provides a fair, reasonable, and adequate recovery to former Intact Inspectors who opted into this case.  Ex. D, Buenker Dec., ¶¶ 6, 9, 10. Under the Settlement Agreement, Plaintiffs will be paid a pro rata share of the uncompensated overtime hours they worked, with the average recovery approximating 85% of calculated damages in the first and second years after fees and costs have been deducted.   Ex. D, Buenker Dec., ¶9.

### D.    Wage and Hour Claims Release

All Plaintiffs will be bound by a release of all wage and hour-related claims through the date of the Court's approval order.  Ex. E, Settlement Agreement, ¶20(b), p. 9.  In addition, the Named Plaintiffs will execute general releases.  Ex. E, Settlement Agreement, ¶ 20, p. 7.

### E.    Attorneys' Fees, Costs, and Expenses

Counsel requests that the Court to approve the parties' agreed-upon attorneys' fee award in the amount of $104,000 and costs and expenses of $10,000. Ex. A, Welmaker Dec. ¶10. This amount equals 40% of the total award and is significantly less than the total fees incurred by Plaintiffs' counsel.  Ex. A, Welmaker Dec. ¶10; Ex. D, Buenker Dec. ¶¶13-14.

 Defendant does not oppose this request. These fees will be used to reimburse counsel for the time and expenses advanced on behalf of the collective.

## IV.    REQUEST FOR FINAL CERTIFICATION AND APPROVAL OF SETTLEMENT

### A.    The Court Should Issue Final Certification of the Conditionally Certified Collective.

As this Court stated in its June 5, 2025 Order:

> Where, as here 'the parties reach settlement after a court has conditionally certified a collective class, the court still must make some final class certification before approving a collective action settlement.' *Burkholder v. City of Fort Wayne*, 750 F. Supp. 2d 990, 993 (N.D. Ind. 2010) (internal quotations and citation omitted). At the final certification stage, 'the court more rigorously reviews whether the representative plaintiff[s] and the putative claimants are in fact similarly situated s[uch] that the lawsuit may proceed as a collective action.; *Smallwood v. Illinois Bell Tel. Co.*, 710 F. Supp. 2d 746, 750 (N.D. Ill. 2010).

Dkt. 70.[3]

---

[3] *See also Gallant v. Arrow Consultation Servs., Inc*., 2020 WL 2113399, at *1 (S.D. Ind. May 4, 2020) (Barker, J.) ("Where the parties reach settlement after a court has conditionally certified a collective class, the court still must make some final class certification before approving a collective action settlement.") (quoting *Burkholder v. City of Fort Wayne*, 750 F.Supp.2d 990, 993 (N.D. Ind. 2010) (collecting cases) (internal quotations omitted)).

As previously noted, based on Plaintiffs' evidence that the putative collective members were subject to the same payment practices and procedures that deprived them of their overtime wages (*see* Dkt. 50-001 (Cooper Declaration) and Dkt. 50-002 (Flueckiger Declaration)), Magistrate Barr issued an Order conditionally certifying the collective on October 2, 2024. Dkt. 53.

As a result of the parties' overall settlement and joint stipulation to FLSA certification, the certified collective ultimately encompassed a total of 17 Inspectors. The hourly Inspectors who opted into this case were all subjected to Defendant's policy of paying straight time pay for hours worked over forty. Dkt. 50-001; Dkt. 50-002. *See also supra*, pp. 5-8.

Accordingly, final certification of the collective action is appropriate. *See Clemens v. Stericycle*, 2016 WL 1054605, at *2 (S.D. Ind. Feb. 17, 2016) (Dinsmore, J.), report and recommendation adopted, 2016 WL 1045550, at *1 (S.D. Ind. Mar. 15, 2016) (Barker, J.) (holding that collective action plaintiff must show that collective members were "victims of a common policy or plan"); *Burkholder*, 750 F.Supp.2d at 994 (concluding that final certification is appropriate where "there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies," and the defendants' "defenses would apply to all [p]laintiffs").

Plaintiffs and the Inspectors included in the conditionally certified collective are alleged "victims of a common policy or plan." *Gallant*, 2020 WL 2113399, at *1 (finding final certification of collective appropriate) (citations omitted).

Because Plaintiffs have shown, even under the more rigorous review that is applied during final certification stage, that the proposed collective members are similarly situated, Plaintiffs respectfully request that this Court grant final certification of the collective and eligible Opt-in Plaintiffs as follows: All Inspectors employed by Intact at any time between May 1, 2022, and the

date the collective action was conditionally certified, October 2, 2024, and who have joined this lawsuit by filing an opt-in form.

> **B.      The Court should approve the Parties' Arms-Length Settlement Agreement as Fair and Reasonable.**

>> **1.      The Agreement Meets the Criteria For Approval**

The settlement agreement satisfies the criteria for approval of an FLSA settlement agreement because: (1) it represents a fair and reasonable compromise of a bona fide dispute between the Parties; (2) it was reached through arm's length negotiations undertaken between counsel for Plaintiffs and for Defendant, and with the assistance of a well- known and experienced neutral mediator; and (3) the value of the recovery outweighs the mere possibility of further relief after protracted and expensive litigation.

The Seventh Circuit has not ruled whether settlement agreements under the FLSA require court approval, but district courts in this Circuit routinely review such agreements for court approval. *See Hoaglan v. Grede Holdings LLC*, No. 20-CV-425-PP, 2022 WL 2703854, at *2 (E.D. Wis. July 12, 2022) (Pepper, C.J.) (collecting cases). "'If the proposed settlement reflects a reasonable compromise over contested issues, the court should approve the settlement.'" *Id.* (quoting *Castillo v. Noodles & Co.,* No. 16-CV-03036, 2016 WL 7451626, at *1 (N.D. Ill. Dec. 23, 2016)).

"'Normally, a settlement is approved where it is the result of 'contentious arm's-length negotiations, which were undertaken in good faith by counsel … and serious questions of law and fact exist such that the value of an immediate recovery outweighs the mere possibility of further relief after protracted and expensive litigation.'" *Jimenez v. Illini Precast LLC*, No. 19-cv-1623-JPS, 2023 WL 1777528, at *3 (E.D. Wis. Feb. 6, 2023) (Stadtmueller, J.) (quoting *Burkholder v. City of Ft. Wayne,* 750 F.Supp.2d 990, 995 (N.D. Ind. 2010)).

In FLSA collective actions, there is only a one-step approval process, and the court does not engage in a fairness hearing. *Henderson v. Russ Darrow Group, Inc*., No. 19-cv-1421-JPS, 2021 WL 973981, at *1 (E.D. Wis. 2021); *see also* Ellen C. Kearns, et al., BNA, The Fair Labor Standards Act, § 18.VI.A.I. (4th ed. 2020) ("In settlements of FLSA collective action claims that present no resolution of state law wage and hour claims under [Federal] Rule [of Civil Procedure] 23, most courts conclude that a fairness hearing is not required.").

Under the FLSA, "[n]ormally, a settlement is approved where it is the result of 'contentious arm's length negotiations, which were undertaken by counsel . . . and serious questions of law and fact exist such that the value of an immediate recovery outweighs the mere possibility of further relief after protracted and expensive litigation." *Gallant*, 2020 WL 2113399, at *2 (quoting *Campbell*, 2012 WL 1424417, at *2) (citations omitted). "Courts are required to determine the fairness of a collective action settlement by assessing 'whether the agreement reflects a reasonable compromise of disputed issues rather than a mere waiver of statutory rights brought about by an employer's overreaching." *Gallant*, 2020 WL 2113399, at *2 (quoting *Burkholder*, 750 F. Supp. 2d at 995); see also Knox, 2017 WL 3834929, at *2 ("A district court should approve an FLSA collective action if it was reached as a result of contested litigation and it is a fair and reasonable resolution of a bona fide dispute between the parties.") (citations omitted). Moreover, "[i]t is a well settled principle that the law generally encourages settlements." (quoting *Dawson v. Pastrick*, 600 F.2d 70, 75 (7th Cir. 1979)).]

The settlement agreement meets these standards and should be approved. First, the parties' settlement was the result of extensive pre-suit investigation by collective counsel; negotiation of a stipulation to conditional certification; voluntary informal discovery related to liability and damages; and private mediation with an experienced complex action mediator. Collective counsel

investigated the pay practices of Defendant and obtained consents to join the litigation from five (5) voluntary opt-in plaintiffs prior to the Court's conditional certification. The parties ultimately agreed, after extensive discussion, to engage in early mediation; this allowed the parties and the Court to avoid extensive and costly discovery and motions practice.

On March 26, 2025, the parties negotiated an arms-length settlement with the assistance of Mediator Frank Neuner, a well-known and respected mediator who specializes in the resolution of complex civil litigation. (Ex. A, Welmaker Dec., ¶8 ); (Ex. D, Buenker Dec., ¶8 .)

Recognizing the uncertain legal and factual issues involved, the parties reached an agreement on the essential terms of a proposed settlement at mediation and thereafter exchanged drafts of the proposed settlement agreement. "In such circumstances, district courts typically have no trouble concluding that a settlement agreement was the result of 'contentious arms-length negotiations.'" *Chen v. Genesco, Inc*., 2020 WL 360517, at *4 (S.D. Ind. Jan. 22, 2020) (Barker, J.) (finding this standard met where agreement was met following a comprehensive pre- suit investigation, private mediation and related discovery, contested motions, and extensive settlement discussions).

Second, continued litigation would involve significant risks for the potential collective members. By way of example, the collective could have been decertified. Plaintiffs also risk losing the merits at summary judgment or at trial or receiving a smaller damages award. A significant dispute exists between the parties as to the period of Defendant's noncompliance with the FLSA; this includes Defendant's position that it became compliant in October 2023, after this lawsuit was filed, when it began paying overtime pay at least some of the time. In addition, the parties agree that a trial on the merits would be expensive and time-consuming for all involved.  Ex. D., Buenker Dec., ¶8. *See Chen*, 2020 WL 360517, at *4 (approving FLSA settlement in light of risks to

plaintiffs at trial on liability and damages because, "[i]n light of those risks, agreeing to a settlement 'is not indicative of overreaching by the employer or waiver of rights by the employees, but of a reasoned and counseled decision by both sides'") (quoting *Heuberger*, 2019 WL 3030312, at *3)).

Third, the proposed allocation of the settlement is fair and reasonable. The parties have agreed on an allocation formula that considers the number of overtime hours and rate of pay worked by each potential collective member during their relevant limitations period. *See Chen*, 2020 WL 360517, at *4; *Summers v. UAL Corp. ESOP Comm.*, 2005 WL 3159450, at *2 (N.D. Ill. Nov. 22, 2005) (approving allocation plan as reasonable when "settlement funds . . . will be disbursed on a pro rata basis"); *Hens v. Clientlogic Operating Corp.*, 2010 WL 5490833, at *2 (W.D.N.Y. Dec. 21, 2010) (allocation formula based on plaintiffs' length of service was "equitable and reasonable"). In this case, the payments are directly proportional to the actual unpaid overtime calculated based on actual hours worked and pay received.  Ex. D, Buenker Dec., ¶9.

### 2.    The Settlement represents a reasonable compromise of this litigation.

There is a strong presumption in favor of finding a settlement fair, particularly where it is the negotiated result of an adversarial proceeding.  *Hispanics United of DuPage Cnty. v. Village of Addison, Ill.*, 988 F.Supp. 1130, 1150 n.6 (N.D. Ill. 1997).  Although the class-action provisions of Federal Rule of Civil Procedure 23 do not apply to FLSA collective actions, courts have looked to the six factors used in class actions for evaluating FLSA settlement proposals: (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles to prevailing on the merits; (5) the possible range of recovery and the certainty of damages; and (6) the respective opinions of the participants, including collective

counsel, the claims representative, and the putative collective members. *Hoaglan v. Grede Holdings LLC*, No. 20-CV-425-PP, 2022 WL 2703854, at *2 (E.D. Wis. July 12, 2022).

### a.    Factor 1: There was no fraud or collusion in reaching the settlement.

The parties engaged in extended, arms-length negotiations over the course of months, using information and documents obtained in this case through discovery and with the benefit of a full day mediation.  Simply put, there was no fraud or collusion by any participant. Ex. A, Welmaker Dec., ¶9.

### b.    Factors 2–5: The case was settled during adversarial litigation. If not resolved, further, extensive litigation would follow.

This case was settled during litigation between the Parties. "[T]hat this settlement is the negotiated result of an adversarial proceeding is an indication of its fairness." *Domingue v. Sun Elec. & Instrumentation, Inc.*, No. CIV.A. 09-682, 2010 WL 1688793, at *1 (M.D. La. Apr. 26, 2010).  Indeed, it was resolved only after substantial investigation and work by the Parties and their counsel. The work undertaken by Plaintiffs and Plaintiffs' counsel included:

- Investigation of Intact and their management and structure;
- Review of Intact's time and pay records for Named Plaintiffs and Opt-ins;
- Review of court records for similar or related cases involving Intact and their related corporate entities;
- Review of legal authority, including court orders and administrative guidance, regarding legal issues before and during the course of the lawsuit;
- Drafting, filing, and serving Plaintiffs' original complaint;
- Interviewing Plaintiffs;
- Analyzing and processing data for Plaintiffs' and the proposed collective's payroll, including creating a damage model for the data;
- Negotiating a settlement with Intact at mediation; and
- Negotiating and finalizing the Parties' Settlement Agreement and approval documents. If the case were not settled, there would be extensive work to come, including additional written discovery to and from all parties and associated discovery disputes, depositions of both sides, dispositive motions, and questions regarding liability, Plaintiffs' damages, and Intact's good faith and willfulness.

Ex. A, Welmaker Dec., ¶8; Ex. D, Buenker Dec., ¶ 7.  Under the facts presented by this case, the compromised settlement represents a fair compromise of the claims. Intact planned significant defenses to both liability and to the issue of liquidated damages and willfulness. The parties could have litigated these issues for years, including through discovery, trial, and appeal, with no guarantee of success for Plaintiffs and the proposed collective. The Settlement avoids this significant risk and provides substantial benefits to all collective members.  Ex. D, Buenker Dec., ¶8.

The Parties engaged in significant work, recognized and appreciated the risks in proceeding if this case were not settled, and (Plaintiffs in particular) recognized that their settlement represented an acceptable compromise of the range and certainty of their damages.

### c.    Factor 6: The participants agree the Settlement is in the best interest of Plaintiffs.

That this Settlement in the best interest of Plaintiffs is an opinion shared by both Plaintiffs and their counsel. Ex. A, Welmaker Dec., ¶ 9. Ex. D, Buenker Dec. ¶¶8-10.  Both Plaintiffs' counsel have served as lead or co-lead counsel in numerous wage-and-hour actions with multiple plaintiffs. For example, both Welmaker and Buenker have successfully recovered unpaid overtime and associated damages on behalf of many workers, including many large-scale wage-and-hour class/collective actions.   Ex. A, Welmaker Dec., ¶¶ 6-7, Ex. D Buenker Dec. ¶4.   Intact is represented by a national firm specializing in employment matters, and Intact's counsel, Courtney M. Witten, was formerly employed by the Wage and Hour Division of the Department of Labor. Defense counsel has extensive resources and vast experience in defending employers in all manner of employment law issues, including FLSA claims.

Because Plaintiffs are represented by experienced counsel, the Court may rely upon their judgment as to the benefits of settlement in relation to the risks of litigation and trial. *Armstrong v.*

*Bd. of Sch. Directors of Cty. of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980), overruled on different grounds, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).

Plaintiffs' counsel agrees the Settlement Agreement is a fair and reasonable compromise of a bona fide dispute regarding the claims alleged by Plaintiffs in light of the procedural posture of the case, the litigation risks, and the litigation costs to Plaintiffs. Ex. A, Welmaker Dec., ¶ 9. Ex. D, Buenker Dec., ¶¶8-9. The Parties have engaged in arm's-length and extended settlement negotiations. Ex. B, Welmaker Dec., ¶ 9. Ex. C Buenker Dec. ¶5. Because the settlement is a fair and reasonable compromise given the considerations outlined above, the Court should approve the Settlement.

### d. The Court should allow a service award for the Representative Plaintiffs.

The terms of the Settlement allow the Representative Plaintiffs, Shon Cooper and Jackie Read, to receive a reasonable service award as set forth in the Settlement Agreement, to be paid from the gross settlement amount for their role in initiating the investigation and litigation of this matter, serving as representative for the collective, responding to counsel's questions, providing documents, participating in settlement discussions and mediation, reviewing the Settlement Agreement, and otherwise assisting counsel.

Courts routinely approve service awards to compensate class representatives for the services they provided and the risks they incurred during the course of the class action litigation. *See, e.g., Hoaglan v. Grede Holdings LLC*, No. 20-CV-425-PP, 2022 WL 2703854, at *4 (E.D. Wis. July 12, 2022) (Pepper, C.J.) (approving $6,000 service award to named plaintiff); *Henderson v. Russ Darrow Group, Inc.*, No. 19-cv-1421-JPS, 2021 WL 973981, at *2 (E.D. Wis. 2021) (Stadtmueller, J.) (approving plaintiffs' requested $2,500 service awards); *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 868 (8th Cir. 2017) (approving $10,000 service award to each named

plaintiff); *Wineland v. Casey's Gen. Stores, Inc.*, 267 F.R.D. 669, 677 (S.D. Iowa 2009) (same); *McClean v. Health Sys., Inc.*, No. 6:11-CV-03037-DGK, 2015 WL 12513703, at *1 (W.D. Mo. Aug. 4, 2015) (approving $5,000 service award to each named plaintiff). Service awards are intended to reflect the substantial service and risk provided by a lead plaintiff, and can often be substantial. *See, e.g., Sanders v. MPRI, Inc.*, No. 5:08-cv-00345-R, ECF No. 180 (W.D. Okla. Oct. 19, 2009) (approving service awards to helpful plaintiffs of up to $14,300); *Lucken Family Ltd. P'ship, LLLP v. Ultra Res., Inc.*, No. 09-cv-01543-REB-KMT, 2010 WL 5387559, at *6 (D. Colo. Dec. 22, 2010) (approving service award of $10,000 as being "well within the range of reasonable incentive awards"); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 373-74 (S.D. Ohio 1990) (approving service awards ranging from $35,000 to $50,000); *Glass v. UBS Financial Servs., Inc.*, No. C-06-4068, 2007 WL 221862, at *16 (N.D. Cal. 2007), aff'd, 331 Fed.Appx. 452 (9th Cir. 2009) (approving $25,000 service awards to each named plaintiff); *Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294, 300 (N.D. Cal. 1995) (approving $50,000 service award to lead plaintiff). "Given [Plaintiffs'] active participation," the proposed service award is reasonable. *Blackburn v. Conduent Com. Sols. LLC*, No. 1:19-CV-1229-RP, 2020 WL 9810023, at *3 (W.D. Tex. Dec. 22, 2020).  Named Plaintiff Shon Cooper's service award of $5,000.00 and Named Plaintiff Jackie Read's service award of $2,500 are reasonable and modest given the assistance and work they put into the case.

> **e.   Plaintiffs' attorneys' fees and litigation expenses are consistent with the *ex ante* approach.**

In addition to the amounts allocated to the Named Plaintiffs and opt-ins under the settlement, the Court also evaluates the reasonableness of the attorneys' fees and costs under the settlement. Here, the amounts are fair and reasonable, and the Court should approve them as well.

"[T]he award of fees and costs to a prevailing plaintiff is mandatory under the FLSA." *Rogers v. City of Virginia Beach*, 182 F.3d 909 (4th Cir. 1999).

> The purpose of the FLSA attorney fees provision is to ensure effective access to the judicial process by providing attorney fees for prevailing plaintiffs with wage and hour grievances. Courts should not place an undue emphasis on the amount of the plaintiff's recovery because an award of attorney fees here encourages the vindication of congressionally identified policies and rights. Indeed, we have upheld substantial awards of attorney's fees even though a plaintiff recovered only nominal damages.

*Fegley v. Higgins*, 19 F.3d 1126, 1134-35 (6th Cir. 1994).

To determine if the fee is appropriate, the Seventh Circuit follows the *ex ante* approach. *Dubinski v. Sentry Ins. a Mut. Co.*, No. 114-CV-00551-TWPDKL, 2015 WL 13640103, at *3 (S.D. Ind. May 28, 2015) (Pratt, J.); *Heekin v. Anthem, Inc*., No. 1:05-CV-01908-TWP, 2012 WL 5878032, at *2 (S.D. Ind. Nov. 20, 2012) (Pratt, J.).

This approach asks the Court to assign fees that "mimic a hypothetical *ex ante* bargain between the class and its attorneys." *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011). "'[A]ttorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services.'" *King v. Trek Travel, LLC*, No. 18-cv-345-WMC, 2019 WL 6790398, at *3 (W.D. Wis. Dec. 12, 2019) (quoting *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013)). Courts "must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time" the litigation began. *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("Synthroid I"). When determining market price, courts should look to the contracts entered into by the parties and class counsel in similar cases, information from other cases, and any applicable auctions for the position of lead counsel. *Taubenfield v. AON Corp*., 415 F.3d 597, 599 (7th Cir. 2005). Additional factors include the quality of the attorneys' performances,

the amount of work necessary to resolve litigation, and the stakes in the case. *Synthroid I*, 264 F.3d at 721.[1]

"The Seventh Circuit has recognized that 'most suits for damages in this country are handled on the plaintiff's side on a contingent fee basis' and that the 'typical contingent fee is between 33 and 40 percent.'" *Benoskie v. Kerry Foods, Inc*., No. 19-cv-684-pp, 2020 WL 5769488, 2020 U.S. Dist. LEXIS 177538, at *8-9 (E.D. Wis. 2020).  (quoting *Gaskill v. Gordon,* 160 F.3d 361, 362 (7th Cir. 1998)); accord *Vela v. City of Houston*, 276 F.3d 659, 681 (5th Cir. 2001) (observing the "customary contingency" in the Fifth Circuit is within the range of 35% to 40%).

Like other causes of action, continent attorneys' fees in FLSA matters "typically" range between 33% and 40%. *King*, 2019 WL 6790398, at *3. And Courts in this Circuit have approved attorneys' fees representing event higher percentages of recovery. *See, e.g., Weiss v. Youtos*, No. 20-cv-990-SLC, 2021 WL 2383210, at *2 (W.D. Wis. Jun. 9, 2021) ("Counsel's 45% contingency arrangement with Weiss is consistent with attorney fees approved in other FLSA settlements in this circuit.").

Here, the Parties' agreement calls for a 40% recovery of the gross settlement amount as fees.  Ex B., Welmaker Dec., ¶10.  Plaintiffs request an attorneys' fee award of $104,000.00, which amounts to 40% of the total value of the settlement proposed here, an amount that is well within the norm for a settlement of this size. This amount also represents only 62% of the lodestar amount billed in this case (*see infra* at p. 25).

Cases declining to review attorneys' fees are in line with the language of the FLSA, which does not require the approval of attorneys' fees. See 29 U.S.C. § 216. "[T]he FLSA's underlying purpose" is, after all, "protecting workers' rights," not ensuring defendants have fairly compensated plaintiff's counsel. *Barbee*, 927 F.3d at 1027 (quoting *Cheeks v. Freeport Pancake*

*House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015)) (internal quotation marks omitted); *see also Lawson v. Procare CRS, Inc.*, No. 18-cv-00248-TCK-JFJ, 2019 WL 112781, at *3 (N.D. Okla. Jan. 4, 2019) ("Unlike settlements of class actions, cases involving infants or incompetent persons, or settlements of non-bona fide disputes, FLSA claims are opt-in, meaning that the named Plaintiffs are represented by counsel and are actively engaged with the litigation" (citing *Fails v. Pathway Leasing LLC,* No. 18-CV-00308-CMA-MJW, 2018 WL 6046428, at *8-9 (D. Colo. Nov. 19, 2018)). As a result, "[t]he Court's review of a proposed FLSA settlement is properly limited only to those terms precisely addressing the compromised monetary amounts to resolve pending wage and overtime claims." *Bench v. Cheyenne Logistics, LLC*, No. 4:14-cv-1327, 2016 WL 2997591, at *3 (E.D. Mo. May 25, 2016) (quotation omitted). "Accordingly, despite discussion of attorney fees in th[is] joint [filing], this Court need not review that aspect of the[ ] motion." *Loveless v. Ecotech, LLC*, No. 4:19-cv-02698-SNLJ, 2020 WL 1032239, at *1 (E.D. Mo. Mar. 3, 2020).

        **f.**      **Alternatively, Plaintiffs' attorneys' fees and expenses were reasonable.**

Should the Court examine the attorneys' fees and expenses, the evidence establishes they were reasonable and necessary in processing this action.

Under the FLSA, Plaintiffs maintained the right to seek recovery of their attorneys' fees and costs. 29 U.S.C. § 216(b) ("The court in such [an FLSA] action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.").

Plaintiffs and Intact disagreed on the number of hours reasonable and necessary for Plaintiffs' prosecution of the case, including both the time already incurred in prosecuting this case, as well as the time fulfilling Plaintiffs' obligations under the settlement agreement, administering the settlement, and responding to Plaintiffs' inquiries. Plaintiffs' counsel Welmaker

incurred, as of May 2, 2025, $56,123.83 in fees and costs in this matter, and Plaintiffs' counsel Buenker has incurred, as of May 2, 2025, more than $112,465.00 in fees and costs in this matter, Ex. A, Welmaker Dec., ¶10; Ex. C, Buenker Dec., ¶¶13-14, for a total lodestar of $168,588.43. The $104,000.00 requested is 62% of this lodestar. Total fees and costs incurred in this matter already exceed the amount of fees and costs Plaintiffs' counsel will receive in this case, and this number will only increase when considering the continuing nature of the obligations Plaintiffs' counsel will have administering the settlement of this fund and resolving any and all questions and issues the opt ins will have both before during and after distribution of the funds. Counsel estimates that they will incur at least $5,000 in additional time in the future on these issues.

Intact has agreed to the payment of Plaintiffs' attorneys' fees in the amount of 40% of the settlement of the case, or $104,000.00, (which results in a negative lodestar for Plaintiffs' counsel and a net loss of $64,588.43). In addition, Intact has agreed to pay Plaintiffs' expenses of $10,000.00 as a part of the settlement. Ex. A, Welmaker Dec., ¶10; Ex. E, Settlement Agreement, Attachment A.

Because the amount the parties propose be paid by Intact for fees and costs is far less than Plaintiffs' counsel's lodestar, the attorneys' fees and expenses should be approved as reasonable and necessary to compensate Plaintiffs' Counsel for the time and resources dedicated to litigating this matter and reaching the Settlement Agreement.

g.    **The settlement distribution process is also fair and reasonable.**

The Court should also approve of the settlement distribution process, which allows the participating plaintiffs to be paid without further action. Unlike in some collective action settlements, there will be no delay associated with gathering additional claim forms.

Rather, participating plaintiffs will receive 50% of their payments within 30 business days of the "Final Effective Date," which is the date this Court approves the settlement. Compare *Gallant,* 2020 WL 2113399, at *2 (settlement checks to be mailed "within 30 days of the Settlement Agreement's Effective Date (that is, the later either 31 days following our Order Granting Approval of the Settlement if no appeal is taken, or the entry of a final order and judgment after any appeals are resolved."). The second 50% of the settlement funds will be paid within 90 days after the first payment.

The Court should also approve reimbursement to collective counsel for their "reasonable out-of-pocket expenses incurred and customarily charged to their clients, [which] were incidental and necessary to the representation of those clients." *In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) (citation and internal quotation marks omitted). *See also, e.g., Gallant*, 2020 WL 2113399, at *4 (reimbursing costs "representing counsel's out-of-pocket costs and expenses incidental and necessary to litigating this matter, including coverage of pro hac vice admission fees, postage, mediator's fees, court fees, and research costs") (citations omitted); *Chen*, 2020 WL 360517, at *5 (same). The Partis have agreed to the reimbursement of counsel's litigation expenses and costs of up to $10,000.00, which Defendant agrees are reasonable and does not oppose. Ex. A, ¶10.

Counsel's expenses, including mediation costs and filing fees, slightly exceed $10,000.00, although counsel is only seeking to recover the sum of $10,000, with the primary expense being Plaintiff's share of the costs of the mediation and the costs involved with the Administrator, the ILYM Group. Ex. A, ¶10; Ex. D, ¶14. Total costs and expenses for a case of this size are reasonable. *Id.*

## V.    CONCLUSION

For the foregoing reasons, the Court should issue an Order finding final certification of the collective to be proper, approving the parties' settlement agreement, ordering payments to be mailed to the collective members as per Exhibit A to the Settlement Agreement, entering a final judgment and dismissing this matter with prejudice, although the parties request that the Court retain jurisdiction to enforce the settlement agreement until final payment has been made, which should occur within 120 days after certification of the collective and approval of the settlement agreement. This requested resolution fairly and reasonably compensates all of the participating collective members for the unpaid overtime wages they allege to have been denied under the Defendant's straight time pay practices.


Respectfully Submitted,

By: */s/ Douglas B. Welmaker*
Douglas B. Welmaker
Texas State Bar No. 00788641
Welmaker Law, PLLC
409 N. Fredonia, Suite 118
Longview, Texas 75601
Tel: (512) 799-2048
doug@welmakerlaw.com

Josef F. Buenker
Texas State Bar No. 03316860
The Buenker Law Firm
Federal ID No. 11498
P.O. Box 10099
Houston, Texas 77206
713-868-3388
713-683-9940 (fax)
jbuenker@buenkerlaw.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF CONFERENCE

Prior to filing this motion, I certify that I conferred with Defendant's counsel, who confirmed Defendant was unopposed to the relief sought herein.  Defendant's counsel also confirmed that no relevant circumstances have changed since the findings made in Magistrate Barr's October 2, 2024, Order, and that Defendant's primary defense, that Plaintiffs and all other hourly Inspectors were independent contractors, would have continued to have been applicable to and asserted against all Inspectors in a similar manner had this case not settled.

*/s/ Douglas B. Welmaker*
Douglas B. Welmaker


## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion for Approval of Settlement Agreement has been electronically served on all counsel of record via Notice of Electronic Filing on a known Filing User through the CM/ECF system on July 3, 2025.

*/s/ Douglas B. Welmaker*
Douglas B. Welmaker